UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RONALD JOHNSON,                                Case No. 22-10025

      Plaintiff,                              F. Kay Behm
v.                                             United States District Judge

ASTON CARTER, INC., *et al.*,

      Defendants.
_____ /

**OPINION AND ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT (ECF No. 35)**

## I.    PROCEDURAL HISTORY

Plaintiff, Ronald Johnson, filed this employment discrimination claim

against Defendants, Aston Carter, Inc., Aerotek, Inc., and Allegis Group, Inc., (ECF

No. 1).  Johnson amended his complaint on February 7, 2022, asserting claims of

race discrimination and retaliation under 42 U.S.C. § 1981, Title VII, and the

Elliott-Larsen Civil Rights Act.  (ECF No. 9).  This matter was previously assigned to

District Judge Bernard A. Friedman and was reassigned to the undersigned on

February 6, 2023.  Johnson's amended complaint was the subject of an earlier

motion to dismiss, decided by Judge Friedman.  (ECF No. 14).  Judge Friedman

dismissed all claims against Defendant Allegis Group and dismissed the Title VII

claims against Defendant Aston Carter.  (ECF No. 14, PageID.135).  Judge

Friedman also found that Johnson failed to plausibly allege a constructive discharge claim. (ECF No. 14, PageID.132-33). Further, the court found all the purported adverse actions Johnson identified in the amended complaint did not rise to the required level except for the "indefinite extension of plaintiff's thirteen-week training period," which Judge Friedman concluded plausibly qualified as an adverse employment action. (ECF No. 14, PageID.134). The court rejected Defendants' argument that the extension was a "mere delay" because they failed to contend that they ever set an end date to the extension. (ECF No. 14, PageID.134). Defendants have now filed a motion for summary judgment on the remaining claims, which is fully briefed. (ECF Nos. 35, 38, 40). The court held a hearing via videoconference on January 10, 2024.

For the reasons set forth below, the court **GRANTS** Defendants' motion for summary judgment.

## II. FACTUAL BACKGROUND

Johnson was employed by Aston Carter from April 19, 2021 through August 13, 2021 as a Recruiter Trainee to work out of its Southfield and Troy, Michigan locations. (ECF No. 35-1, pp. 21:12-15, 25:21-23, 21:12-15, 77:3-5, 195:25-196:5). Johnson is African American. *Id*. at 76:8-10. As a Recruiter Trainee, Johnson was paid an hourly wage, plus time and one-half for hours worked over 40 per week.

2

*Id*. at 27:4-29:22.  His starting rate of pay was $14/hour, which increased to

$16.50/hour on June 26, 2021.  (ECF No. 35-6, ¶ 13).

Like other Recruiter Trainees, Johnson began his employment with a 13-

week training period.  (ECF No. 35-1, p. 74:3-11; ECF No. 35-3, p. 36:2-23).

Practice Lead Robert VanDam, an Aston Carter employee based in Kalamazoo,

Michigan, supervised Johnson.  (ECF No. 35-1, p. 76:1-3; ECF No. 35-2, 12:8-11).

VanDam reported to Director of Market Operations Christopher Anthony, an

Aston Carter employee based in Southfield, Michigan.  (ECF No. 35-3, pp. 14:15-

15:5, 16:18-22, 18:19-21).  Anthony and VanDam are Caucasian.  *Id*. at 11:11-13;

ECF No. 35-2, p. 7:21-22.  On July 21, 2021, Johnson was assigned to Practice Lead

Morgan Burstein, an Aston Carter employee based in Troy, Michigan.  (ECF No.

35-1, pp. 79:5-7, 85:6-16).  Burstein, who is Caucasian, reported to Anthony.  (ECF

No. 35-3, p. 18:19-23; ECF No. 35-5 ¶ 2).

According to Defendants, all Recruiter Trainees are expected to meet the

same objective weekly metrics: 25 G2s, eight Internal Interviews, and two

Submittals.  (ECF No. 35-5, ¶ 12).  A "G2" call is akin to a "general interview;" it is

"the first time you talk on the phone" with a person about working for Aston

Carter, with the goal of learning about their skills and job interests and creating a

record of the types of work they might be qualified to perform.  (ECF No. 35-1, p.

30:14-23; ECF No. 35-2, p. 23:19-24:1; ECF No. 35-3, p. 77:11-14).  An "Internal

Interview" is a conversation between a Recruiter Trainee and a candidate for a

particular temporary assignment, where the Recruiter Trainee would "interview[]

[the candidate] one last time to make sure [the candidate is] a good fit for the

position that [the Recruiter Trainee is] trying to fill."  (ECF No. 35-1, p. 32:15-25;

ECF No. 35-3, p. 77:15-18).  The third metric, a Submittal, is recorded when a

Recruiter Trainee submits a candidate's resume to a client for consideration to

begin a particular temporary assignment.  (ECF No 35-1, p. 36:3-9; ECF No. 35-3,

p. 77:19-21).  Johnson disputes that he was provided concrete objective metrics

to complete for promotion to full recruiter.  (ECF No. 35-1, pp. 37-38).  But he

testified that he was required to complete five G2s per day, which translates into

25 per week.  (ECF No. 35-1, p. 30).  He further testified that both of his

supervisors had the "same exact metrics," "five G2s a day" and "three submittals

a week."  (ECF No. 35-1, p. 245).  Johnson denies the requirement for Internal

Interviews was eight per week but does not recall the number requirement.  (ECF

No. 35-1, pp. 38-39).  Further, VanDam told Johnson not to worry about the

numbers as long as he had the G2s.  (ECF No. 35-1, p. 37:12-18).  During the time

that he supervised Johnson, VanDam met weekly with him to discuss his

performance.  (ECF No. 35-2, pp. 43:19-44:3, 44:13-16).  The two were based in

different locations, so meetings usually were held virtually, though sometimes the two met in person.  (ECF No. 35-1, p. 77:3-9).

On July 7, 2021, Johnson attended an offsite event to celebrate the promotion of one of his Aston Carter co-workers.  (ECF No. 35-1, pp. 124:20-125:21; ECF No. 35-13).  The event occurred at Oak Street Grille in Royal Oak, Michigan.  (ECF No. 35-1, p. 131:17-24; ECF No. 35-13).  The event was attended by about 30 people, including Johnson, Anthony, Burstein, Recruiter Carla Campanella, who is Caucasian, and Recruiter Michael Marcel, who is also Caucasian, among others.  *Id*. at 127:2-5, 128:7-129:1, 132:11-24, 134:10-17, 141:19-23.  VanDam traveled from Kalamazoo for the event.  *Id*. at 128:7-11.

After the promotion recognition portion of the event had finished, Greg Crane, a former co-worker and friend of VanDam, also came to Oak Street Grille.  (ECF No. 35-1, pp. 134:23-135:10; ECF No. 35-4, ¶ 7).  Crane is African American.  (ECF No. 35-1, p. 151:8-11; ECF No. 35-4, ¶ 14).  At some point during the evening, Johnson had a brief conversation with VanDam and Crane.  (ECF No. 35-1, pp. 128:7-11, 135:6-21; ECF No. 35-4, ¶¶ 9-12).  According to Johnson, the environment allowed them to speak with each other in a normal voice and to hear each other.  (ECF No. 35-1, pp. 144:13-145:24).  In response to

5

interrogatories, Johnson offered the following "full content" of "every racial comment or joke" he contends were made by VanDam on July 7, 2021:

> Racial Joke: [VanDam] told a story about him inviting [Crane]… to his daughter's birthday party. [VanDam] then proceeded to mention that he intentionally had "watermelon and fried chicken" at the party due to [Crane] being the only "black" person there. [VanDam] also stated that [Crane] felt uncomfortable at the party because he made the joke an ongoing thing at the party. During the discussion [VanDam] used the "N-word."

(ECF No. 35-14, pp. 5-6).  Crane denied that he ever attended a birthday party for VanDam's daughter, or even visited his home.  (ECF No. 35-4, ¶ 16).  Crane also denied that VanDam even invited him to any event where watermelon and fried chicken were served and has never joked about serving those items in his presence.  Crane also denied that VanDam ever told a story like that described by Johnson in his presence and has never heard him use the "N" word.  *Id.* at ¶¶ 16-17.  VanDam testified that he told a story about how Crane went to dinner with his girlfriend to meet her family and would not eat the chicken and watermelon served in front of certain people because he did not want to be stereotyped.  (ECF No. 35-2, p. 56).  He further explained that the purpose of sharing the story was because "it's an eye-opening thing that everyone has different aspects to themselves that, as a manager, you may or may not know and every person is different in ways you don't know about." *Id.*

Johnson testified that he left the event and called another Aston Carter employee, Keith Thomas (who is African American), to discuss VanDam's comments. (ECF No. 35-1, pp. 76:17-77:2, 168:15-170:5). Johnson's understanding is that Thomas then contacted Anthony to report what Johnson had told him. *Id*. at 172:2-15. Anthony testified that he spoke with Thomas, and Thomas said Johnson had heard insensitive or racial comments, but not by VanDam. (ECF No. 35-3, pp. 90:15-24, 111:22-112:8). Anthony contacted Johnson to ask what had happened. *Id*. at 88:15-89:18, 90:25-91:15. Anthony testified that during that call, Johnson attributed the comments to Crane and did not accuse VanDam of making insensitive or racial comments. *Id*. at 94:7-95:12. Anthony offered to speak with VanDam, but Johnson said that he would talk to VanDam himself. (ECF No. 35-1, pp. 175:23-177:1). However, according to Thomas's declaration, he explicitly stated to Anthony that it was his understanding that VanDam made a racist statement. (ECF No. 38-5, ¶ 5).

Johnson and VanDam continued to interact, but Johnson never raised any complaint about the event to VanDam. (ECF No. 35-1, 179:10-20). Johnson admits that he does not know whether VanDam was aware of his complaint. *Id*. at 180:17-23. VanDam and Anthony testified they did not discuss Johnson's complaint until after Johnson had submitted his resignation. (ECF No. 35-3, p.

64:9-15; ECF No. 35-2, p. 30:1-6).  Notably, however, Defendants state in their

EEOC Position statement and interrogatory responses that Anthony "confronted"

VanDam regarding Johnson's allegation.  (ECF No. 38-10, p. 4; ECF No. 38-11, p.

11).  At the hearing, Defendants' counsel maintained that the information about

the confrontation in the EEOC position statement was a mistake and their

answers to interrogatories were amended.  In those amended answers,

Defendants indicated that on July 8, 2021, Thomas contacted Anthony to relay

what Johnson said, and indicated that Johnson heard someone use the "N" word,

but he did not know who it was.  (ECF No. 35-22, PageID.652).  On that same day,

Anthony spoke with Johnson, who indicated he was not sure whether he heard

the "N" word used at the bar and did not know who said it.  *Id*.  Johnson indicated

he would speak with VanDam directly and asked Anthony not to investigate or

take any action.  *Id*. at PageID.653.

On July 21, 2021, Anthony switched Johnson's supervisor from VanDam to

Morgan Burstein.  (ECF No. 35-1, 85:6-18).  Anthony made this decision because

Johnson's performance was consistently not meeting expectations under

VanDam's supervision, and because Anthony wanted Johnson to work with

"[Aston Carter's] very best, who is Morgan Burstein . . . ."  (ECF No. 35-3, pp.

99:18-111:22).  Johnson claims that Anthony switched Plaintiff's supervisor from

VanDam to Burstein following Johnson's complaint about the incident and *because* of Johnson's complaint.  But in support of this claim, he points to Anthony's testimony that the switch was because he could sense that Johnson was not comfortable with VanDam and their personalities did not mesh well. (ECF No. 35-3, pp. 99-100).  Johnson also finds it significant that Anthony said that Johnson's training would not be extended.  *Id*. at 126:12-16; *see also* Plaintiff's Exhibit 5.

As part of Johnson's transition to Burstein's team, she reviewed his performance metrics and observed that he had never satisfied them.  (ECF No. 35-3, p. 101:4-17).  Burstein's initial reaction was that Johnson's employment should be terminated due to his unsatisfactory performance during his training period. (ECF No. 35-5, ¶¶ 10-12; ECF No. 25-2, pp. 18:16-19:1).  Before making her decision, Burstein consulted with VanDam.  (ECF No. 35-2, pp. 18:13-19:1; ECF No. 35-5, ¶ 12).  VanDam believed that Johnson had the soft skills needed to succeed in the job and just needed to be more disciplined and work harder to succeed, and he encouraged Burstein to extend Johnson's training period instead.  (ECF No. 35-2, pp. 18:13-19:7; ECF No. 35-5, ¶ 12).  Burstein decided to provide Johnson an additional two weeks to improve, with no change to his job duties or to his compensation.  (ECF No. 35-3, pp. 102:9-11, 16-21; ECF No. 35-1, p. 88:16-23; ECF

9

No. 35-5 ¶ 12).  Upon Burstein's request, Anthony approved the extension.  (ECF

No. 35-3, pp. 101:4-17, 102:9-11, 107:1-3; ECF No. 35-2, pp. 18:13-19:7; ECF No.

35-5, ¶ 13).

Johnson, for his part, says he does not remember anyone telling him he

was not meeting performance metrics, including Burstein.  (ECF No. 35-1, pp. 91-

92).  Despite Defendants' assertion that Burstein wanted to terminate Johnson,

she is recorded encouraging him to stay, saying he's "f*cking crushing it."

(Plaintiff's Exhibit 6 at 1:25-1:38).  Approximately a week after stating Johnson's

training would not be extended, Anthony approved Burstein's extension request.

(ECF No. 35-1, pp. 185:15-19; 250:5-7).  According to Johnson, the "only

intervening factor was Plaintiff's complaints of racism."  (ECF No. 38, PageID.683).

However, Johnson's characterization of his racism complaint as an "intervening"

factor does not appear accurate.  Johnson complained to Thomas, who reported

the racism complaint to Anthony on July 7, 2021.  The conversation about not

extending training occurred on July 21, 2021.  Shortly thereafter, Burstein reached

out to Anthony to approve extending Johnson's training.  Accordingly, the racism

complaint occurred weeks before Anthony said training would not be extended.

VanDam recommended to both Burstein and Anthony that Johnson's training

period be extended, instead of terminating him for poor performance.  (ECF No.

35-2, pp. 18-19).  This decision was communicated to Johnson on July 29, 2021.

(ECF No. 35-3, pp. 112:22-113:5; ECF No. 35-5, ¶ 14).  Johnson maintains that

VanDam communicated the extension to him, not Burstein, and he was told that

VanDam made the decision.  (ECF No. 35-1, pp. 87-88, 90:3-22).  On July 30, 2021,

Johnson submitted a letter of resignation to Burstein, Anthony, VanDam, and Juan

McCausland in Human Resources.  (ECF No. 35-1, pp. 191:17-191:3; ECF No. 35-

16; ECF No. 35-6, ¶ 5; ECF No. 35-5, ¶ 15).  The resignation letter referred to

"racial misconduct" but did not include any details.  (ECF No. 35-16).

According to McCausland, Johnson declined to meet with him to share

details before his exit interview, but McCausland tried to investigate what he

could.  (ECF No. 35-6, ¶ 8).  Johnson finally responded to his requests, and they

spoke on the last day of his employment.  Johnson told McCausland that he felt

uncomfortable during a discussion with VanDam and Crane at an off-site event on

July 7, 2021, but says Johnson did not accuse VanDam of making racist statements

or saying the "N"word.  *Id*.[1]  During that conversation, McCausland offered to

Johnson that he could continue working at Aston Carter, but he declined the

offer.  *Id*.  McCausland says he was not able to uncover any evidence during his

---

[1] This is not accurate, given that the racism complaint was the very thing McCausland
was investigating and Johnson and McCausland discussed it in their phone calls.

investigation that VanDam used the "N" word or made any other racist statements.  *Id*. at ¶ 9.  Anthony, Burstein and McCausland attempted to convince Johnson to remain with Aston Carter and complete the last two weeks of his training period, but he refused their offers.  (ECF No. 35-3, pp. 110:23-111:12; ECF No. 35-6, ¶ 8; ECF No. 35-5, ¶ 16; ECF No. 35-18).  Johnson's last day of employment with Aston Carter was August 13, 2021.  (ECF No. 35-16).

On August 27, 2021, Johnson filed a charge of discrimination with the Equal Employment Opportunity Commission against Aerotek, Inc. (ECF No. 35-19), and he subsequently received a notice of right to sue letter against Aerotek.  (ECF No. 9-1).  Johnson has not filed any other charge.  (ECF No. 35-1, p. 226:2-22.)

## III.   ANALYSIS

### A.   Standard of Review

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . .; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to

support the fact."  Fed. R. Civ. P. 56(c)(1).  The standard for determining whether

summary judgment is appropriate is "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that

one party must prevail as a matter of law."  *State Farm Fire & Cas. Co. v.

McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby,

Inc.*, 477 U.S. 242, 251–52 (1986)).  Furthermore, the evidence and all reasonable

inferences must be construed in the light most favorable to the non-moving

party.  *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986).

Where the movant establishes the lack of a genuine issue of material fact,

the burden of demonstrating the existence of such an issue then shifts to the non-

moving party to come forward with "specific facts showing that there is a genuine

issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  That is, the

party opposing a motion for summary judgment must make an affirmative

showing with proper evidence and to do so must "designate specific facts in

affidavits, depositions, or other factual material showing 'evidence on which the

jury could reasonably find for the plaintiff.'"  *Brown v. Scott*, 329 F. Supp. 2d 905,

910 (6th Cir. 2004).  In order to fulfill this burden, the non-moving party only

needs to demonstrate the minimal standard that a jury could ostensibly find in his

favor.  *Anderson*, 477 U.S. at 248; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797,

800 (6th Cir. 2000).  However, mere allegations or denials in the non-movant's

pleadings will not satisfy this burden, nor will a mere scintilla of evidence

supporting the non-moving party.  *Anderson*, 477 U.S. at 248, 251.

 The court's role is limited to determining whether there is a genuine

dispute about a material fact, that is, if the evidence in the case "is such that a

reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477

U.S. at 248.  Such a determination requires that the court "view the evidence

presented through the prism of the substantive evidentiary burden" applicable to

the case.  *Id*. at 254.  Thus, if the plaintiff must ultimately prove its case at trial by

a preponderance of the evidence, on a motion for summary judgment the court

must determine whether a jury could reasonably find that the plaintiff's factual

contentions are true by a preponderance of the evidence.  *See id.* at 252–

53.  Finally, if the nonmoving party fails to make a sufficient showing on an

essential element of its case for which it carries the burden of proof, the movant

is entitled to summary judgment.  *Celotex*, 477 U.S. at 323.  The court must

construe Rule 56 with due regard not only for the rights of those "asserting claims

and defenses that are adequately based in fact to have those claims and defenses

tried to a jury," but also for the rights of those "opposing such claims and

defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis." *Id*. at 327.

B.    Race Discrimination

Johnson's race discrimination claims are brought under 42 U.S.C. § 1981 and the ELCRA as to Aston Carter and additionally under Title VII as to Aerotek. "Both Title VII of the Civil Rights Act and § 1981 follow identical methods" for proving individual racial discrimination. *Bailey v. Oakwood Healthcare, Inc*., 2017 WL 3616478, at *7 (E.D. Mich. Aug. 23, 2017), aff'd, 2018 WL 1907166 (6th Cir. Apr. 23, 2018) (citing *Rosser v. Pipe Fitters Local 392*, 12 F.3d 214 (6th Cir. 1993)). It is equally well established that "claims of race discrimination brought under the ELCRA are analyzed under the same standards as claims of race discrimination brought under Title VII." *Id*. (quoting *Dotson v. Norfolk S. R.R. Co.*, 52 F. App'x 655, 657 (6th Cir. 2002)). Thus, all of Johnson's race discrimination claims are analyzed under the same standards that govern Title VII discrimination claims.

To prove his race discrimination claim, Johnson must establish that (1) he was a member of a protected class; (2) he suffered an adverse employment action; (3) he was otherwise qualified for the position; and (4) he was replaced by someone outside the protected class or treated differently than a similarly situated, non-protected employee. *Deleon v. Kalamazoo Cnty. Road Comm'n*, 739

F.3d 914, 918 (6th Cir. 2014).  To prevail on an employment discrimination claim,

a plaintiff must provide either direct evidence of intentional discrimination by the

defendant or circumstantial evidence that would allow an inference of

discriminatory treatment.  *Talley v. Bravo Pitino Rest.*, 61 F.3d 1241, 1246 (6th Cir.

1995).  If a plaintiff successfully establishes these four elements, the burden then

shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the

adverse employment action.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792,

802-03 (1973).  If the defendant successfully supplies such a legitimate reason,

the burden then falls on the plaintiff to demonstrate that the proffered reason is

mere pretext.  *Id*. at 804.  Defendants argue that Johnson failed to establish a

prima facie case for several reasons.  However, because the court concludes that

Johnson's claim fails because he has not identified any similarly situated non-

protected employee who was treated differently, it need not address Defendants'

other arguments regarding the race discrimination claim.

Under Sixth Circuit law, to establish that he was treated differently than

similarly situated employees, Johnson must show that he and his proposed

comparators were similar in all relevant respects.  *Ercegovich v. Goodyear Tire &*

*Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998).  In every case, the court must make

an "independent determination" of what factors are relevant, and that

determination depends on whether certain factors "are meaningful to the particular claim of discrimination presented."  *Rembert v. Swagelok Co.*, 2023 WL 3094546, at *7 (6th Cir. Apr. 26, 2023) (quoting *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012), abrogated on other grounds by *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)); *see also Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006) (explaining the necessity of independently determining factors relevant to this inquiry).

Johnson attempts to compare his treatment to other white recruiter-trainees supervised by VanDam, specifically Emily Denotter and Hanna Barbieri. Johnson says he was treated differently than these two comparators in the following ways: (1) he was the only recruiter trainee to have their training period extended; (2) Johnson was not given the same privileges as non-African American recruiter trainees in the 13-week training program in that Barbieri and Denotter were able to work from home when Johnson was not allowed to despite all three being managed by VanDam; (3) the other trainees were allowed to leave early; (4) unlike the other trainees, Johnson was paired with an individual who had already submitted his resignation and was "completely checked out" and nonresponsive; (5) unlike Barbieri, Johnson did not work in the same office at VanDam and was

frustrated that VanDam did not work in the same office as him and feels he would have benefited from being in the same office as his trainer.

*Rembert* is instructive.  There, the court looked to the defendant's proffered reasons for taking adverse action against the plaintiff, which was his recent domestic violence conviction.  2023 WL 3094546, at *7.  Thus, the court found two factors relevant for comparators: (1) the type of criminal conviction on the proposed comparators' records (i.e., whether the crime was violent or nonviolent), and (2) the amount of time between that conviction and the proposed comparators' application to the defendant.  *Id*.  The plaintiff was convicted of a domestic violence offense three weeks before he interviewed for the job.  All eight comparators were different in at least one relevant respect: four were convicted of seemingly nonviolent offenses and the other four were not convicted of their violent offenses even within one year of their application, let alone mere weeks.  *Id*.  Thus, the court concluded that none of the proposed comparators were similarly situated in all relevant respects.  *Id.*

Similarly, Johnson's comparators miss the mark.  Defendants assert that Johnson's training was extended because he consistently failed to satisfy the weekly metrics required for Recruiter Trainees.  Accordingly, he must identify comparators who (1) are Recruiter Trainees not in his protected class who (2)

consistently failed to satisfy those same benchmarks, but whose training was not extended. *See e.g.*, *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1116 (6th Cir. 2001) (plaintiff failed to identify an adequate comparator because he offered no evidence of another employee with similar performance deficiencies.). Johnson does not offer any evidence that either Barbieri or Denotter are Recruiter Trainees outside his protected class who failed to satisfy those same metrics and whose training was not extended. In contrast, Defendants identified four Caucasian Recruiter Trainees, supervised by VanDam or Burstein, who also had their training periods extended due to failing to meet the Recruiter Trainee metrics. (ECF No. 35-22, PageID.655-56). Based on the record before the court, Johnson presents no evidence of similarly situated individuals outside his protected class who were treated differently than he was. Accordingly, Johnson's discrimination claim must fail. *See e.g.*, *Johnson v. University of Cincinnati*, 215 F.3d 561, 587 (6th Cir. 2000) (where "plaintiff has presented no evidence to establish either that he was replaced by someone [outside his protected class] or that other [employees] who were similarly situated were treated differently," the court held his discrimination claim "cannot survive"). The court, therefore, grants Defendants' motion for summary judgment on Johnson's discrimination claims.

C.    Hostile Work Environment

Defendants contend that Johnson's hostile work environment claim does

not satisfy the "severe or pervasive" prong of the applicable standard.  "A hostile

work environment claim requires proof that (1) plaintiff belongs to a protected

class; (2) [ ]he was subject to unwelcome harassment; (3) the harassment was

based on race; (4) the harassment affected a term, condition, or privilege of

employment; and (5) the defendant knew or should have known about the

harassment and failed to take action."  *Phillips v. UAW Int'l*, 854 F.3d 323, 327

(6th Cir. 2017).  The elements are substantially the same for an ELCRA claim.  *Id*.

at n.3 (citing *Quinto v. Cross & Peters Co*., 547 N.W.2d 314, 319–20 (Mich. 1996)).

To be actionable, however, the relevant conduct must be "so severe or pervasive

as to constitute a hostile or abusive working environment both to the reasonable

person and the actual victim*." Randolph v. Ohio Dep't of Youth Servs*., 453 F.3d

724, 733 (6th Cir. 2006).  "In determining whether an actionable hostile work

environment claim exists, we look to all the circumstances, including the

frequency of the discriminatory conduct; its severity; whether it is physically

threatening or humiliating, or a mere offensive utterance; and whether it

unreasonably interferes with an employee's work performance." *Nat'l R.R.*

*Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (internal citation omitted).

As to the third prong, the only prong at issue here, "the conduct must be 'severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive.'" *Warf v. U.S. Dep't of Veterans Affairs*, 713 F.3d 874, 878 (6th Cir. 2013) (quoting *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000)). "[O]ffhand comments" and "isolated incidents" do not suffice. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 515 (6th Cir. 2009) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

The Sixth Circuit has set "a relatively high bar for what amounts to actionable discriminatory conduct under a hostile work environment theory." *Phillips v. UAW Int'l*, 854 F.3d 323, 328 (6th Cir. 2017) (noting that in many cases, overtly discriminatory statements and racial slurs did not create a hostile work environment under this standard). Indeed, the court has found "even offensive and bigoted conduct insufficient to constitute a hostile work environment if it is neither pervasive nor severe enough to satisfy the claim's requirements." *Phillips*, 854 F.3d at 328 (citing *Williams v. CSX Transp. Co.*, 643 F.3d 502, 513 (6th Cir. 2011) (finding no hostile work environment where defendant "call[ed] Jesse Jackson and Al Sharpton 'monkeys' and [said] that black people should 'go back to where [they] came from'" among other racist comments); *Reed v. Procter &*

*Gamble Mfg. Co*., 556 F. App'x 421, 432 (6th Cir. 2014) (no hostile work

environment where plaintiff was subjected to race-based comments and his

supervisor stood behind him and made a noose out of a telephone cord); *Clay v.*

*United Parcel Serv., Inc*., 501 F.3d 695, 707-708 (6th Cir. 2007) (fifteen racially-

motivated comments and instances of disparate treatment over a two-year

period were isolated, not pervasive, and therefore not actionable under Title VII)).

Johnson contends that the single use of the "N" word is sufficient to create

a hostile work environment, relying on *Johnson v. United Parcel Serv., Inc*., 117 F.

App'x 444 (6th Cir. 2004).  In *Johnson v. UPS*, however, a single use of the "N"

word was not at issue.  Instead, there were a number of racially charged incidents

involving racist language and persistent toleration of physical abuse by a white

worker.  *Id*. at 454.  To be sure, the court observed that case law makes clear that

the use of the "N" word even taken in isolation, is not a "mere offensive

utterance."  *Id*. at 454 (quoting *McGinest v. GTE Serv. Corp*., 360 F.3d 1103, 1116

(9th Cir. 2004)); *see also Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th

Cir. 2001).  But this utterance was also accompanied by comments about being

tired of African Americans complaining, accusations that the plaintiff was

falsifying records and stealing company time, supervisors mocking African

American speech on multiple occasions, refusals to address grievances because

supervisors were racist, and violence by white employees insufficiently addressed. *Id*. at 453-54.  While Johnson contends that he has presented more than the single incident with VanDam and Crane, the evidence supporting a race-based hostile work environment was far more pervasive in *Johnson v. UPS* than what Johnson identifies here.  VanDam often said that Johnson reminded him of Crane, who actually had nothing in common with Johnson other than both were African American.  (ECF No. 35-1, pp. 83:14-17, 130:4-10, 136:3-11).  Although, VanDam testified that he wanted Johnson to meet Crane because they both had similar performance struggles early on and VanDam believed that Crane's success would be motivating to Johnson.  (ECF No. 35-2, p. 55).  Further, VanDam occasionally referred to Johnson as Crane.  (ECF No. 35-1, p. 83:7-9).  Similarly, his management questionably referred to him as "homie" and "brother," on one occasion each.  (ECF No. 38-12; ECF No. 38-23).  Considering the totality of the evidence marshaled by Johnson and even assuming the allegations as outlined by Johnson are all true, his hostile work environment falls short when compared to binding cases from the Sixth Circuit such as *Williams*, 643 F.3d at 506, 513 (no hostile work environment where defendant "call[ed] Jesse Jackson and Al Sharpton 'monkeys'" and said "black people should 'go back to where [they] came from'" among other racist comments) and *Philips*, 854 F.3d at 328, 330 (Listing

union black union reps he would fire; referring to employee as a "bodyguard"
because he was "big and black"; comments that there were "too many blacks" in
the union and on the local board; comments that if the local had more whites, it
would not have the kind of problems it was having; comments that UAW
representative separated grievances based on race and said he would dismiss
them).[2]  Accordingly, the court finds that Johnson's hostile work environment
claim must fail and grants Defendants' motion for summary judgment on this
claim.

D.    <u>Retaliation</u>

As with discrimination claims, retaliation claims brought under § 1981 and
ELCRA are analyzed under the same standard as Title VII retaliation claims.
*Thomas v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of
Am.*, 2018 WL 3159708, at *6 (E.D. Mich. June 28, 2018).  To establish a *prima
facie* case of retaliation, a plaintiff must establish that: (1) he engaged in a
protected activity; (2) his "exercise of such protected activity was known by the
defendant; (3) thereafter, the defendant took an action that was 'materially
adverse' to the plaintiff; and (4) a causal connection existed between the

---

[2]  While this court does not necessarily agree with the analysis or the outcome reached
by the Court of Appeals in these cases, it is bound to follow them.

protected activity and the materially adverse action." *Rogers v. Henry Ford Health Sys.*, 2018 WL 3629057, at *8 (6th Cir. July 31, 2018) (quoting *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014)).  Under Sixth Circuit precedent, to satisfy the knowledge element for a retaliation *prima facie* case, a plaintiff must show that the employer's "relevant management decisionmakers" knew of plaintiff's "exercise of protected activity."  *Fenton v. HiSAN, Inc.*, 174 F.3d 827, 832 (6th Cir. 1999).  "An employment decision cannot be caused by protected activity if the decisionmaker did not know about the protected activity."  *Crane v. Mary Free Bed Rehab. Hosp.*, 634 F. App'x 518, 526 (6th Cir. 2015); s*ee also Garg v. Macomb County Community Mental Health Services*, 472 Mich. 263, 275-76 (2005) (Michigan Supreme Court held that where plaintiff "failed to show that defendant knew that she was engaged in [protected] activity … there could be no 'retaliation' on the employer's part"); and *Howard v. William Beaumont Hosp.*, 2013 WL 6730054, at *7 (E.D. Mich. Dec. 19, 2013) (Goldsmith, J.) ("[w]ithout either of [the decisionmakers] aware of [p]laintiff's protected activity, [p]laintiff cannot establish the knowledge component necessary for her *prima facie* case").

Defendants argue that Johnson cannot establish a material question of fact on all three elements of a prima facie retaliation claim.  The court need not address whether the extension of his training period was a materially adverse

action or whether causation has been satisfied because Johnson has failed to

show that the decision maker had knowledge of his race based complaint.

Defendants argue that Johnson's retaliation claim must fail because the

undisputed evidence shows that the decision maker (Burstein) did not have

knowledge of his complaint.  According to Defendants, the record confirms that

Burstein was Johnson's supervisor and she made the decision to extend his

training period for two weeks.  (ECF No. 35-5, ¶ 12; ECF No. 35-3, pp. 102:9-11,

107:1-3; ECF No. 35-2, pp. 18:13-19:7).  Burstein wanted to terminate Johnson for

failing to meet his performance metrics, but VanDam urged her to extend

Johnson's training period instead.  (ECF No. 35-2, pp. 18:13-19:7; ECF No. 35-5,

¶ 12).  Defendants argue that given that Burstein was not aware of Johnson's

complaint, the requisite knowledge of Johnson's protected activity cannot be

imputed to her for purposes of the retaliation claims.  (ECF No. 35-5, ¶ 15).

In response, Johnson contends that Anthony was the decision maker and

he had knowledge of the complaint.  More specifically, Johnson argues that he

complained of perceived racism directly to Anthony prior to the decision to

extend his training.  (ECF No. 35-3, pp. 90-91; ECF No. 35-1, pp. 251-252).

Johnson told Anthony that he feared retaliation for bringing it up.  (ECF No. 35-3,

p. 98:13-16).  Johnson also points out that it was Anthony, not Burstein or

VanDam, who had the authority to extend his training period and made the final decision to do so.  (ECF No. 35-2, p. 18:1-9).

Burstein was the decision maker and there is no evidence that she was aware of Johnson's complaint.  As the Sixth Circuit explains, a supervisor is a decision maker even if a higher-level manager must approve her request or recommendation that an employee be terminated.  *Hussain v. Highgate Hotels, Inc.*, 126 F. App'x 256, 262 (6th Cir. 2005) (citing *DiCarlo v. Potter*, 358 F.3d 408, 417 (6th Cir. 2004), overruled on other grounds by, *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009)).  In *DiCarlo*, the supervisor submitted a memorandum to his manager "requesting [the employee's] removal for failure to meet satisfactory performance levels."  *Id*. at 413.  Because the manager agreed with the assessment, he approved the termination.  *Id*.  The Sixth Circuit held that the supervisor was "clearly ... an individual with decision making authority" because the decision to terminate the employee was made on the supervisor's recommendation by a manager who agreed with the supervisor's assessment.  *Id*. at 417.  Likewise, here, the uncontradicted evidence shows that Burstein made the decision to extend Johnson's training and the need for Anthony's approval does not change her status as the decision maker.  Given that there is no evidence suggesting Burstein was aware of Johnson's complaint, Johnson's prima facie case

must fail on this element.  *See Fenton*, 174 F.3d at 832 (summary judgment to employer where plaintiff "[did] not me[e]t her burden of showing that her protected activity was known to those who made th[e] decision").  Accordingly, summary judgment in Defendants' favor on Johnson's retaliation claims is granted.

      E.    <u>Johnson's Employer</u>

Defendants maintain that Johnson was employed by Aston Carter and not Aerotek.  In response, Johnson argues that Aerotek and Aston Carter are joint employers.  Because the court has otherwise determined that summary judgment in favor of Defendants on all of Johnson's claims is warranted, it need not resolve this issue.

**IV.   CONCLUSION AND ORDER**

For the reasons set forth above, the court **GRANTS** Defendants' motion for summary judgment.

      **SO ORDERED**.

Date:  March 27, 2024          <u>s/F. Kay Behm</u>
                                    F. Kay Behm
                                    United States District Judge